**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VICTOR ONAFUYE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09 C 5100 |
| | ) |
| JP MORGAN CHASE NA, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Victor Onafuye ("Onafuye"), an African-American man of Nigerian descent, claims that Defendant JP Morgan Chase NA ("Chase") rejected Onafuye's four applications for employment with Chase because of his race, nationality, and age. In this lawsuit, Onafuye alleges that Chase violated the Civil Rights Act, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA").[1] He also alleges a claim of intentional infliction of emotional distress. Chase has moved for summary judgment, arguing that it had legitimate, non-discriminatory reasons for failing to hire Onafuye, and that Onafuye's claim for intentional infliction of emotional distress is preempted by the Illinois Human Rights Act. For the following reasons, Defendant's motion is granted.

## FACTUAL BACKGROUND

Plaintiff Victor Onafuye is an African-American man of Nigerian descent who was fifty-three years old at the filing of this action.[2] (Def.'s Rule 56.1(a) Statement of Material Facts (hereinafter

---

[1] In his original complaint, Onafuye invoked the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, as well, but he appears to have withdrawn any ADA claim in his amended complaint.

[2] The facts presented here are drawn from the parties' Local Rule 56.1(a) statements and supporting materials. Despite being warned about the requirements of the Local Rule [62], in several instances, Onafuye submitted responses to Defendant's Rule 56.1 statement that are
(continued...)

"Def.'s 56.1."), ¶ 1.; Am. Compl. ¶ 8.) Onafuye has a Bachelor of Science degree in aeronautical and astronautical engineering from the University of Illinois at Champaign-Urbana, a Master of Business Administration degree from Governors State University at University Park, Illinois, and thirty years experience in information technology. (Onafuye Aff. ¶ 5, Ex. 17 to App. in Supp. of Pl.'s Rule 56.1(a) Statement of Disputed Facts (hereinafter "App. to Pl.'s 56.1").) Onafuye applied for four separate positions with Chase. He applied for (1) the Technology Executive-Program Management Director ("Technology Executive") position on February 12, 2008; (2) the Vice-President of the Project Manager Office ("VP-PMO") position on July 1, 2008; (3) the Senior Technology Program Manager ("STPM") position on August 26, 2008, and; (4) the Project Manager position on July 11, 2009. (Candidate File, Ex. 10 to App. to Pl.'s 56.1, at A101-02.) Chase did not hire Onafuye for any of the four positions. (Onafuye Aff. ¶ 6.)

**I.     The Chase Application and Recruitment Process**

Chase receives applications for employment through its website and in response to job postings with job boards and associations. (Def.'s 56.1 ¶ 5.) Onafuye contends that Chase receives applications in response to "word of mouth referral[s]" as well. (Pl.'s Resp. to Def.'s Rule 56.1(a) (hereinafter "Pl.'s 56.1") [81], at ¶¶ 5-6.) Chase asserts that its online recruitment system, called "Taleo," cannot be manipulated by Chase employees. (Def.'s 56.1 ¶¶ 6, 7.) Plaintiff disputes this, insisting that Chase recruiters alter applications, but he offers no evidence in support of this charge.

Chase recruiters review applications as they are received and contact those candidates

---

[2](...continued)
unsupported by the record. In such instances, Chase's factual assertions are deemed admitted pursuant to Local Rule 56.1(b). *See* Local Rule 56.1(b)(3)(B) ("the response [to the movant's statement] must, in the case of disagreement, [cite] specific references to the affidavits, parts of the record, and other supporting materials relied upon."); *see also* Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

whose qualifications match the job descriptions, forwarding the applications of qualified candidates to a hiring manager for further review. (Cron Dep. 31:15-24, Ex. 4 to App. to Pl.'s 56.1; Def.'s 56.1 ¶ 9.)[3] In some instances, Chase receives such a large volume of applications for a particular opening that it does not review all of them. (Def.'s 56.1 ¶ 10.) As a matter of company policy, Chase often promotes internal candidates to open positions. (*Id.* at ¶ 11.)

Chase maintains an anti-discrimination and affirmative action policy that prohibits discrimination in hiring based on, *inter alia*, race, age or national origin. (Def.'s 56.1 ¶ 12.) As part of the hiring process, Chase requests that applicants voluntarily provide information regarding their Equal Employment Opportunity characteristics, *e.g.*, gender, ethnicity, veteran status, etc. (*Id.* at ¶ 13.) Chase requests this information for purposes of reporting to the Equal Employment Opportunity Commission only; the information is not visible to recruiters and hiring managers. (*Id.* at ¶ 14.) Finally, Chase notes that applications are not screened based on the applicant's name. (*Id.* at ¶ 15.) Onafuye denies this, but the only "fact" he cites is that the four candidates interviewed "for the position in question"[4] had Caucasian-sounding names. (Pl.'s 56.1 ¶ 15.)

## II. Plaintiff's Four Employment Applications

### A. The Technology Executive – Program Management Director Position

Onafuye applied for the Technology Executive position on February 12, 2008. (Pl.'s 56.1 ¶ 16.) As Todd Cron explained in his affidavit, 331 people applied for this position, and a woman

---

[3] Onafuye insists that, as a federal contractor, Chase is mandated by law to review all applications submitted and to refer the application of any minimally-qualified applicant to the hiring manager for further review. He cites no evidence in support of this assertion, but the court concludes that any dispute on this issue is not a material one; Onafuye has not demonstrated that Chase's compliance, or lack thereof, with hiring regulations imposed on federal contractors makes it more likely that Chase passed Onafuye over for reasons related to his age, race, or national origin.

[4] Onafuye does not explain which position he is referring to, nor does he name the four candidates. As explained below, one of the four positions was never filled by any candidate, meaning Chase hired only three candidates "over" Onafuye.

3

named Patricia Tennant was hired for it.[5]  (Def.'s 56.1 ¶¶ 17, 19.)  Chase rejected Onafuye's application on April 24, 2008, by entering into Taleo, "Requisition filled:  Did not review this candidate or the slate satisfied with earlier candidates."  (*Id.* at ¶ 18; Candidate File at A101.)

Onafuye states that, as one of the first applicants, his application should have been reviewed.  (Pl.'s 56.1 ¶ 17.)  Yet he does not offer any evidence in support of his assertion that his was one of the first applications submitted, nor does he cite any Chase rule or policy requiring chronological review of applications.  He suspects that his application was in fact reviewed and was rejected for discriminatory reasons, especially in light of the fact that Defendant acknowledged that he was a "better fit" for a director position than for a project manager position.[6]  (*Id.* at ¶ 18.)  Onafuye asserts that Patricia Tennant was less qualified than he, but again fails to substantiate this assertion with any evidence.

### B. The Vice-President of the Project Manager Office Position

On July 1, 2008, Onafuye submitted an application for the VP-PMO position.  (Pl.'s 56.1 ¶ 20.)  Rebecca Noel, who had been hired by Chase in early July 2008, became the hiring manager for this position.  (Def.'s 56.1 ¶¶ 21-22, 24.)  Noel had worked for Chase since 1985 except for a brief period from late 2006 through July of 2008.  (*Id.* at ¶ 23.)  Her initial job duties included establishing the department she was to manage, and analyzing the job requirements for the VP-PMO position, re-writing them if necessary.  (*Id.* at ¶¶ 25-26.)  Noel did in fact re-write the requirements for the position.  (*Id.* at ¶ 27.)  After the revised requirements were posted, a fellow

---

[5]  Plaintiff denies these statements as unsupported by documentation, but he has not explained why Cron's affidavit is insufficient.

[6]  It does appear that a Chase manager deemed Onafuye suitable for a director position, but the only evidence in the record that substantiates that fact corresponds to Onafuye's application for the Project Manager position—a position he applied for seventeen months after he first applied for the Technology Executive position.  (*See* Cortese Dep. 16:23-17-1, Ex.6 to App. to Pl.'s 56.1) ("[The hiring manager] said he felt Victor was more at the director level, and didn't meet the skills of this Project Manager position.")  Thus, this fact bears no relation to Chase's decision not to hire Onafuye for the Technology Executive position in 2008.

4

Chase employee, Nanette Gertz, referred Melissa Moehrlin to Noel as a candidate. (*Id.* at ¶ 28; Noel Dep. 29:13-30:5.) Noel and Gertz had both worked with Moehrlin previously (Noel for some twenty years) and were familiar with Moehrlin's work. (Def.'s 56.1 ¶¶ 29-30.) Moehrlin was chosen for the position following a few interviews with Noel and other Chase employees. (*Id.* at ¶¶ 31-33.) In her deposition, Noel stated that she did not have Moehrlin in mind when she wrote the position requirements, that she did not review Onafuye's application for the position, and that she was never aware of Onafuye's age, race, or national origin. (*Id.* at ¶¶ 34-36.; Noel Dep. 45:4-46:1.)

Onafuye agrees with Chase regarding the date of his application and the fact that the VP-PMO position was open when Noel was hired. (Pl.'s 56.1 ¶¶ 20, 24.) Beyond that, however, Onafuye denies all of Chase's assertions about Moehrlin's hire. (*Id.* at ¶¶ 21-23, 25-36.) Onafuye cites to no evidence in support of his denials beyond urging that Noel's deposition testimony is insufficient without additional verification. (*Id.* at ¶¶ 21-23, 30, 32.) He asserts that Noel could have deduced his race and nationality from his name, and his age from the date he graduated from college (*id.* at ¶ 36), but has not rebutted her testimony that she did not in fact review his application at all. Defendant's version is deemed admitted.

### C. The Senior Technology Program Manager Position

Onafuye applied for the Senior Technology Program Manager position on August 26, 2008. (Pl.'s 56.1 ¶ 37.) Todd Cron, who has worked as an executive recruiter for Chase since 2004, managed the recruiting for this position, and Laurette Pistilli, the Executive Director-Technology Director, was the hiring manager. (Def.'s 56.1 ¶¶ 38-39, 42; Pistilli Aff. ¶ 2, Ex.16 to App. to Pl.'s 56.1.) According to Cron, 320 people submitted applications for this job, and, by the time Cron first took over recruiting for it, the position had already been open for some time. (Def.'s 56.1 ¶¶ 40-41;Cron Dep. 24:23-25:3, Ex. 4 to App. to Pl.'s 56.1.) By this time, Cron explained, Chase was in the final stages of hiring an internal candidate, Maria Goodman, who had been employed by Chase since May 2003 and was ultimately offered the position on February 11, 2009. (Def.'s 56.1 ¶¶ 43-

45.) At the time Chase selected Goodman, Cron did not know her age, race, or nationality. (*Id.* at ¶ 46.) Following Goodman's hire, the applications of the unsuccessful applicants, including Onafuye, were "closed out" in the computer system. (*Id.* at ¶ 51.) When Cron closed out Onafuye's file, he selected a default status entry from a drop down menu reading, "status change rejected, did not meet the minimum qualifications." (*Id.* at ¶¶ 51-54.) Neither Cron nor Pistilli ever reviewed Onafuye's application or interviewed him for this position, (*id.* at ¶¶ 47-48), and neither was aware of Onafuye's age, race, or national origin. (*Id.* at ¶¶ 49, 55.)

Onafuye again denies much of this information. (Pl.'s 56.1 ¶¶ 38-41, 44-49.) Onafuye does agree that Cron closed out the applications after Goodman was hired, and he admits that he never spoke with Pistilli or revealed his age, race, or national origin to her by telephone. (*Id.* at ¶¶ 50-52; Onafuye Dep. 25:2-16, Ex.3 to App. to Pl.'s 56.1.) Onafuye nevertheless asserts, without any support, that the "status change" entry in his application file was not a default, and that Cron knew that Onafuye was well-qualified and met the minimum qualifications when he closed out Onafuye's application. (Pl.'s 56.1 ¶¶ 52-53.) Onafuye also denies, again without citing any evidence, that Cron had not interviewed him, had not spoken to him, and was not aware of his age, race, or national origin. (*Id.* at ¶¶ 53-55.) Because Onafuye cites nothing in the record to support these denials, the court disregards them.

### D.   The Project Manager Position

Adam Cortese, who started as an executive recruiter for Chase in 2007, was the executive recruiter assigned to the Project Manager position for which Onafuye applied on July 11, 2009. (Pl.'s 56.1 ¶¶ 56-57.) Of the 311 applications submitted for that position, Cortese did review Onafuye's application and spoke with Onafuye on August 31, 2009. (*Id.* at ¶ 60.) Then, based on this review and conversation, Cortese forwarded Onfuye's application to the hiring manager, Phillip Marrera. (*Id.* at ¶ 61.) Cortese testified that in spite of this interaction with Onafuye, and despite having seen Onafuye's name, it never occurred to Cortese that Onafuye might be foreign-born.

6

(Cortese Dep. 22:4-18, Ex.6 to App. to Pl.'s 56.1.) When Cortese submitted Onafuye's application to Marrera, Marrera stated that he "felt Victor was more at the director level and didn't meet the skills of this Project Manager position." (*Id.* at 16:23-17:1.) As a result of this conversation, Cortese rejected Onafuye's application citing "Lack of relevant skills/aptitudes/experience" as the reason–a default explanation commonly selected by recruiters, according to Cortese. (Def.'s 56.1 at ¶ 64; Cortese Dep. 18:6-19.) Marrera was not aware of Onafuye's age, race, or national origin when he reviewed the application, nor has he ever spoken to or met Onafuye. (Def.'s 56.1 ¶¶ 65-66.) Onafuye received a computer-generated notice of rejection for the Project Manager position via e-mail. (*Id.* at ¶ 67.) Ultimately, Chase cancelled the position due to a budget reduction and a change in project load; no one was hired for the position, and the position was never reopened. (*Id.* at ¶¶ 68-69.)

Onafuye generally agrees that he applied for the position, that Cortese reviewed his application and spoke to him about it, that Cortese forwarded his application to Marrera, that Phillip Marrera never spoke to or met him, and that he received an automated rejection letter. (Pl.'s 56.1 ¶¶ 56-57, 60-61, 66-67.) He otherwise denies facts presented by Chase on the basis that Chase has purportedly offered insufficient information to verify its statements of fact. (*Id.* at ¶¶ 58, 68.) He agrees that Marrera told Cortese that Onafuye was over-qualified for the Project Manager position and that he would be a better fit for a director position, but he denies that Marrera told Cortese that Onafuye did not meet the Project Manager qualifications. (*Id.* at ¶ 63.) Once again, Onafuye cites no evidence in support of his denials and the court deems Chase's statements fo fact admitted.

### III.    Onafuye's Deposition Testimony

Onafuye acknowledges that he never interviewed in person for any position. (Pl.'s 56.1 ¶ 71.) Onafuye admits, further, that no employee made discriminatory comments to him. (*Id.* at ¶ 73.) He denies Defendant's statements that he did not disclose his age, race, or national origin

during any conversation with Chase employees, but does not identify evidence of any such conversation or disclosure. (*Id.* at ¶ 70.) In Onafuye's deposition, he admitted that he never told anyone his age or race over the phone and cannot remember any discussion of his national origin over the phone either. (Onafuye Dep. 25:17- 27:7.) His recruiters were nevertheless aware of his race, he says, because he did answer Chase's voluntary Equal Employment Opportunity questions. (*Id.* at 23:5-8.) Onafuye stated his belief that "everyone" has access to the demographic information from these questions and, based on his experience with recruiting systems he believes are similar to Chase's, he "knows" the information is normally provided to recruiters. (*Id.* at 23:5-24:19.) Onafuye believes that his age, race, and national origin all played a role in Chase's hiring decisions, but suspects that his race was the most important reason and the determining factor. (*Id.* at 30:6-32:12.)

## **DISCUSSION**

The court will grant summary judgment where there are no genuine issues of material fact. FED. R. CIV. P. 56(a). When considering a motion for summary judgment, the court construes all facts and draws all reasonable inferences "in the light most favorable to the nonmoving party." *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011) (citation omitted). That said, "[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors . . . ." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Springer*, 518 F.3d at 484 (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)).

**I.     Title VII / Section 1981 Claim**

Under Title VII, it is illegal for an employer "to fail or refuse to hire . . . or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  Onafuye alleges that Chase violated Title VII and the Civil Rights Act, 42 U.S.C. § 1981 by intentionally discriminating against him on the basis of his race and national origin.  (Am. Compl. ¶ 16.)  An individual claiming race discrimination under Title VII or § 1981 may avert summary judgment by satisfying one of two standards.  *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849-50 n. 7 (7th Cir. 2010).  Under the direct method, Onafuye must put forth "enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue" of fact.  *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 719 (7th Cir. 2005) (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 940 (7th Cir. 1997)).  Direct evidence is that which will prove a fact without requiring an inference whereas circumstantial evidence does require the finder of fact to infer intentional discrimination.  *Lewis v. Sch. Dist. 70*, 523 F.3d 730, 742 (7th Cir. 2008).

Alternatively, under the indirect method, Onafuye can survive summary judgment "by establishing a prima facie case [of race-based discrimination] under the *McDonnell Douglas* formula." *Id*.  That formula requires Onafuye to show that (i) he is a member of a protected class; (ii) he applied for an available position for which he was qualified; (iii) he was rejected for the position; and (iv) another similarly situated individual, not a member of Onafuye's protected class, was hired.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Coleman v. Donahoe*, ___ F.3d ___ , 2012 WL 32062 at *6 (7th Cir. Jan. 6, 2012).  As explained below, the court concludes Onafuye has not presented sufficient evidence under either the direct or indirect method.

Under the direct method, even drawing all reasonable inferences in a light most favorable to Onafuye, he has not provided evidence showing Chase's discriminatory intent.  It is no surprise that Onafuye can offer no direct evidence of Chase's alleged discrimination; such evidence is only

rarely available. Indeed, Onafuye recognizes that Chase "will not admit that Plaintiff was not hired because of his age, race and national origin." (Pl.'s Resp. to Def.'s Mem. of Law in Support of Its Mot. for Summ. J.(hereinafter "Pl.'s Resp. to Def.'s Mem."), at 14.) But neither has he presented a "'convincing mosaic of circumstantial evidence'" that would permit an inference of unlawful motivation. *Coleman*, 2012 WL 32062 at *18 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Significantly, Onafuye has no recollection of ever disclosing his race or nationality to any Chase representative he communicated with by phone (Onafuye Dep. 25:17-27:7), and he admits that no Chase employee made any discriminatory comment to him. (Pl.'s 56.1 at ¶ 73.) The circumstantial evidence he cites amounts to no more than his own assertions that, because his credentials are so far superior to those of the hired candidates, the only logical explanation for his rejection is unlawful discrimination. (Pl.'s Resp. to Def.'s Mem at 14-16.)

This theory is a non-starter. Though Onafuye believes his race and national origin can be deduced from his name (Pl.'s Resp. at 3)[7], Chase asserts, and Onafuye does not refute, that Chase recruiters never even reviewed his application for three of the four positions. (Def.'s 56.1 ¶¶ 18, 35, 47-48.) It is not uncommon for Chase to receive a large volume of applications when a position opens, making review of all applications impracticable. (*Id.* at ¶ 10.) Yet Onafuye insists, without any support, that all his applications were indeed reviewed or that Chase's failure to do so is itself the result of intentional discrimination. (Pl.'s 56.1 ¶¶ 18, 35, 47-48.) According to Onafuye, as a federal contractor, Chase is statutorily mandated to review all applications that are timely submitted. (Pl.'s Resp. to Def.'s Mem. at 20.) Onafuye does not cite the source of this purported legal

---

[7] He also contends Chase recruiters must have been aware of his race and nationality because of the information he provided voluntarily for EEOC reporting purposes. (Onafuye Dep. at 23:5-24:19.) Onafuye asserts, without evidence beyond his own belief, that "everybody" has access to the demographic information from these questions and, based on his experience with recruiting systems he believes are similar to Chase's, he "knows" the information is normally provided to recruiters. (*Id.* at 23:14-24:1.) Yet he has offered no evidence whatsoever that Chase departed from EEOC standards and instead made the demographic information available to its recruiters and hiring managers.

obligation–but even assuming that Chase is statutorily mandated to review all applications, its failure to do so presumably victimized all applicants, not just those in statutorily-protected groups. Chase's alleged failure to comply with federal contractor law simply does not establish that Chase engaged in any intentional discrimination when it failed to hire Onafuye.

As explained above, Chase recruiters did review Onafuye's application for the Project Manager position. Significantly, on that one occasion when his application was in fact reviewed, it was well-received and advanced to the next stage of the hiring process. The hiring manager ultimately determined that Onafuye's skills were not suited to the Project Manager position and rejected his application. (Def.'s 56.1 ¶¶ 63-65.) Still, Onafuye cannot ask the court to infer discrimination based on the race and nationality of the candidate Chase did select, because, in fact, no one was ever hired for the Project Manager position due to budget constraints. (Def.'s 56.1 ¶¶ 68-69.) Onafuye's principal argument—that he was more qualified than the person hired—inevitably falls apart here.

Because Chase never reviewed Onafuye's application in the other three instances, comparing his qualifications to those of the successful applicants is not useful. The court notes, however, that the record does not fully support Onafuye's insistence that the successful applicants were all women with no more than ten years of experience and a high school diploma. (Pl.'s Resp. to Def.'s Mem. at 13-16.) The record contains no information concerning the qualifications of Patricia Tennant, who was hired for the Technology Executive position. Melissa Moehrlin, hired for the Vice President-Project Manager Office position, was a referral with whom the hiring manager had worked for twenty years at a Chase predecessor company. (Def.'s 56.1 ¶¶ 29-30.) Maria Goodman had been working for Chase for almost six years when she was promoted to the position of Senior Technology Program Manager as an internal hire. (*Id.* at ¶¶ 43-45.) Onafuye denied these assertions, but offers no evidence to the contrary. (Pl.'s 56.1 ¶¶ 11, 19, 29, 33, 43-45.) Nor can Onafuye explain why it would have been improper for Chase to consider, in candidate

11

assessment, its own firsthand knowledge of the successful candidates' skills and abilities as demonstrated during their employment by Chase or with current Chase employees. The court concludes Onafuye has not assembled the "convincing mosaic" of evidence necessary for him to survive summary judgment under the direct method.

Onafuye's claim is no stronger when analyzed under the indirect method. As noted, that method requires Onafuye to show that (i) he is a member of a protected class; (ii) he applied for an available position for which he was qualified; (iii) he was rejected for the position, and; (iv) another similarly situated individual, not a member of Onafuye's protected class, was hired. *McDonnell Douglas*, 411 U.S. at 802; *Coleman*, 2012 WL 32062 at *6. Although neither side has identified the qualifications necessary for the four jobs Onafuye sought, Onafuye's credentials–degrees in engineering and business administration, and substantial experience in information technology–are impressive, and the court will assume that Onafuye was qualified for the positions he sought. The court will assume, further, that the women hired for three of those positions are not in the protected class. With respect to the first prong of the test, however, Onafuye has not effectively rebutted Chase's assertions that it was unaware of his race or national origin. His applications for three of the four positions went unreviewed. For the fourth—the Project Manager position—Cortese referred Onafuye's application to a second round of review before Marrera rejected it, but again, he presents no evidence that either Cortese or Marrera ever knew his race or national origin.

If Onafuye had satisfied the first three elements of his indirect method case, he would need to present evidence that the successful candidates' qualifications were no better than his. Onafuye believes his qualifications are so impressive that Chase's selection of other candidates for the positions he sought can only be a function of discrimination. Even apart from the fact that Chase officials were not aware of his race or national origin, the record does not support his suspicion. With respect to the Technology Executive position, the record is silent as to the qualifications of successful applicant Patricia Tennant. (Cron Aff. ¶ 9, Ex.15 to App. to Pl.'s 56.1.) The Project

Manager position was never filled at all, so there is no successful candidate to whom Onafuye can compare himself. (Def.'s 56.1 ¶¶ 68-69.) Regarding the VP-PMO and STPM positions, however, Chase has presented non-discriminatory explanations for preferring the candidates it chose. Rebecca Noel hired Melissa Moehrlin for the VP-PMO position because Moehrlin fit the job description and she had already proved her professional worth to Noel over the twenty-year span they worked together. (Def.'s 56.1 ¶¶ 29-30.) Onafuye speculates that Noel altered the job requirements so that she could hire Moehrlin (Pl.'s 56.1 ¶ 35), but he offers no evidence in support of that speculation, nor any basis for the inference that Noel's alleged effort to engineer the job requirements was motivated by the race or national origin of any candidate. Maria Goodman, hired for the STPM position, was an internal candidate, and her selection was consistent with Chase's policy of promoting incumbent employees. (Def.'s 56.1 ¶¶ 11, 43-45.)

Onafuye insists that any explanation Chase offers for not hiring him is a pretext for discrimination. "Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (quoting *Russell v. Acme-Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Onafuye is particularly troubled by the notion that he was deemed overqualified for the Project Manager position (Pl.'s Resp. to Def.'s Mem. at 19-20), yet not even interviewed when higher level positions were available. But again, there is no evidence that, amidst the barrage of applications submitted, a Chase recruiter ever reviewed Onafuye's application for those three, higher-level positions. The admission by a Chase hiring manager that she reviewed only internally-referred candidates for one job (*id.* at 20) supports, rather than rebuts, the assertion that Chase does not in fact review all of the applications it receives.

Finally, Onafuye suggests that Chase's practice of considering internal candidates is itself improper. He cites *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 528-29 (6th Cir. 2001), for the proposition that word-of-mouth hiring is, by its nature, discriminatory. (Pl.'s Resp. to Def.'s Mem. at 21.) That case held that the N.A.A.C.P. had standing to challenge the defendant

city's hiring process, which had resulted in a disproportionately low number of African-American city employees, under a disparate impact theory. *Parma*, 263 F.3d at 528-30. Onafuye, by contrast, is proceeding under a disparate treatment theory. In any event, he has offered no evidence that Chase's practices result in an disproportionate work force or proliferate the effects of past discriminatory hiring decisions. There is nothing inherently discriminatory about internal or word-of-mouth hiring. *See, e.g., Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513-14 (7th Cir 1996) (rejecting plaintiff's claim that word-of-mouth hiring is discriminatory and stating that "[i]t is not enough for a plaintiff to demonstrate that an employment practice could theoretically be used to discriminate—Title VII does not forbid subjective selection processes.")

Onafuye has not established a dispute of material fact on his claims of discrimination under Title VII.

**II.     ADEA Claim**

Onafuye fares no better under the ADEA. According to the ADEA, "[i]t shall be unlawful for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). While the statutory language in the ADEA is similar to that used in Title VII, the causation requirement for proof of an ADEA claim is stricter. Whereas, under Title VII, Congress expressly authorized discrimination claims where race was a motivating factor in the employer's decision, it set the bar higher for age discrimination claims by requiring "but-for" causation. *Gross v. F.B.L. Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2349-51 (2009). "In other words, proof that the plaintiff's age was a motivating factor, but not a determinative factor, in the employer's decision, will not suffice to establish the employer's liability." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) (citing *Gross*, 129 S. Ct. at 2352).

Onafuye presents his age discrimination claim together with his race and nationality-based discrimination claim, and relies on the same evidence in support of all of his claims. For the same

14

reasons described above, the court concludes that Onafuye has not shown that, but for his age, Chase would have hired him, and thus, his ADEA claim must also be dismissed. Plaintiff Onafuye appears to agree that his age was not the determinative factor in Chase's decision not to employ him; he testified that age, race, and national origin all played a role in Chase's decision, but that race was the determining factor in Chase's decisions. (Onafuye Dep. 30:6-32:12.) Chase's motion for summary judgment on the ADEA claims is granted.

**C.      Intentional Infliction of Emotional Distress**

Onafuye has not formally presented a claim of intentional infliction of emotional distress ("IIED"), he does allege "severe emotional distress" in the amended complaint. (Am. Compl. at 8.) In its motion for summary judgment, Chase counters that any state law tort claim for IIED is preempted by the Illinois Human Rights Act ("IHRA"). (Def.'s Mot. for Summ. J. ¶ 7.) The IHRA "preempts all state law claims 'seeking redress for a 'civil rights violation' within the meaning of [the] statute.'" *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (quoting *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 515-16, 639 N.E.2d 1273, 1276 (Ill. 1994)). In other words, the court lacks jurisdiction to hear a common law action that is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 517, 687 N.E.2d 21, 23 (Ill. 1997).

In this case, any emotional distress Onafuye suffered is "inextricably linked" to Chase's allegedly discriminatory refusal to hire him because of his race, national origin, and age—the alleged civil rights violation that forms the basis for Onafuye's other two claims. Onafuye effectively concedes that his state law claim is preempted, but appears to believe he is entitled to proceed on that claim because he filed a timely charge with the Illinois Department of Human Rights. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 7.) The conclusion that his claim is preempted, however, means that Onafuye is entitled to recover only for the violation of his civil rights. Because his civil rights claims are dismissed, the intentional infliction of emotional distress claim will be dismissed

15

as well. In any event, courts hesitate to find a claim for intentional infliction of emotional distress in employment situations. *See Graham v. Commonwealth Edison Co.*, 318 Ill. App.3d 736, 746, 742 N.E.2d 858, 867 (1st Dist. 2000). And there is no basis in this record for any conclusion that Chase's conduct was extreme or outrageous.

Onafuye also asserts a "federal claim of [i]ntentional emotional distress." (Pl.'s Resp. to Def.'s Mem. at 23.) There is no such cause of action under federal law. The court grants summary judgment in favor of Defendant on this claim, as well.

## **CONCLUSION**

Defendant's motion for summary judgment [58] is granted. This case is dismissed with prejudice.

ENTER:

Dated: February 7, 2012

_____
REBECCA R. PALLMEYER
United States District Judge